NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

_____

**CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION, DATONG JUQIANG ACTIVATED CARBON CO., LTD., BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., NINGXIA MINERAL & CHEMICAL LIMITED, SHANXI SINCERE INDUSTRIAL CO., LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, CALGON CARBON CORPORATION, NORIT AMERICAS INC., FKA CABOT NORIT AMERICAS, INC.,**
*Defendants-Appellees*

_____

2022-1298

_____

Appeal from the United States Court of International Trade in No. 1:20-cv-00007-MAB, Chief Judge Mark A. Barnett.

_____

Decided: May 1, 2023

_____

DHARMENDRA NARAIN CHOUDHARY, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, Washington, DC, argued for plaintiffs-appellants.  Also represented by JORDAN CHARLES KAHN, KAVITA MOHAN, FRANCIS JOSEPH SAILER.

MARGARET JANTZEN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BRIAN M. BOYNTON, CLAUDIA BURKE, MOLLIE LENORE FINNAN, PATRICIA M. MCCARTHY; ASHLANDE GELIN, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

MELISSA M. BREWER, Kelley Drye & Warren, LLP, Washington, DC, argued for defendants-appellees Calgon Carbon Corporation, Norit Americas Inc. Also represented by JOHN M. HERRMANN, JULIA KUELZOW, ROBERT ALAN LUBERDA.

————————————

Before HUGHES, STOLL, and STARK, *Circuit Judges.*

STARK, *Circuit Judge.*

This case involves an appeal from a final judgment of the United States Court of International Trade ("CIT") sustaining the results of remand proceedings before the United States Department of Commerce ("Commerce"). Specifically, Appellants ask us to reverse certain aspects of the CIT's review of Commerce's eleventh administrative review ("AR11") of antidumping duties for activated carbon from the People's Republic of China ("China"). AR11 pertains to activated carbon that entered the United States during the period of review ("POR") of April 1, 2017 through March 31, 2018. For the reasons set out below, we affirm.

# I

## A

Antidumping duties may be imposed when Commerce "determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value" and such sales are injuring or could injure domestic industry. 19 U.S.C. § 1673. A product is "dumped" when it is sold or likely sold at less than fair value. "Sales at less than fair value are those sales for which the 'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) or 'constructed export price.'" *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (quoting 19 U.S.C. § 1677(35)(A)).

Commerce "determine[s] the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . add[ing] an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1)(B). The factors of production include, but are not limited to, the "hours of labor required," the "quantities of raw materials employed," the "amounts of energy and other utilities consumed," and the "representative capital cost, including depreciation." *Id.* § 1677b(c)(3).

Because China is considered a nonmarket economy country, Commerce cannot simply use the price that producers charge in China as the normal value for its antidumping duty assessment. Therefore, "in valuing factors of production under paragraph (1), [Commerce] shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are . . . at a level of economic development comparable to that of the nonmarket economy country, and . . . significant producers of comparable merchandise." *Id.* § 1677b(c)(4). When able, Commerce prefers to "value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2); *see also*

19 U.S.C. § 1677b(c)(4) ("The administering authority, in valuing factors of production under paragraph (1), shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries.").

Ultimately, Commerce calculates a weighted-average dumping margin for each individually investigated exporter and producer, and an estimated rate for all other exporters and producers. *See* 19 U.S.C. §§ 1673d(c)(1)(B)(i), 1677f-1(c). Commerce will also periodically review the antidumping duty amount upon request. *See Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1321 (Fed. Cir. 2020).

B

Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corp. (collectively, "Carbon Activated") and Datong Juqiang Activated Carbon Co., Ltd. ("DJAC") were selected by Commerce as mandatory respondents in AR11. J.A. 43. Commerce tabulated preliminary weighted-average dumping margins for Carbon Activated and DJAC, and a separate rate for non-examined respondents, [1] and then adjusted its calculations to compute final dumping margins. J.A. 43-44; J.A. 3-36 (hereinafter the "*Final Results Memorandum*"); J.A. 37-39 (*Certain Activated Carbon from the People's Republic of China*, 84 Fed. Reg. 68,881 (Dep't of Com. Dec. 17, 2019)).

In the *Final Results Memorandum*, Commerce made several determinations as to value inputs that are relevant to this appeal. First, Commerce relied on Malaysia as the primary surrogate country, after also considering

---

[1]    Beijing Pacific Activated Carbon Products, Co., Ltd.; Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.; Ningxia Mineral & Chemical Ltd.; and Shanxi Sincere Industrial Co., Ltd. are not mandatory respondents but they are among the Appellants to this appeal.

Romania. J.A. 6-11. Second, Commerce valued all of Carbon Activated's and DJAC's bituminous coal pursuant to Harmonized System ("HS") 2701.12 ("Bituminous Coal, Not Agglomerated," J.A. 141) – but, because Malaysian import statistics under HS 2701.12 were unreliable, Commerce instead used Romanian import values classified under the same subheading (i.e., HS 2701.12). J.A. 11-18. Third, Commerce valued Carbon Activated's and DJAC's coal tar pitch under HS 2708.10 ("Pitch from coal and other mineral tars," J.A. 62) using Malaysian import statistics. J.A. 18-21.

Appellants appealed Commerce's determinations to the CIT. J.A. 40-70; *see also Carbon Activated Tianjin Co. v. United States*, 503 F. Supp. 3d 1278 (Ct. Int'l Trade 2021). The CIT remanded Commerce's decision to select Malaysia as the primary surrogate country because Commerce did not adequately explain its selection of Malaysia and rejection of Romania. J.A. 50-57. The CIT also remanded Commerce's valuation of bituminous coal because Commerce had not considered the impact Thai Chapter 27, Subheading Note 2, which limits the applicability of HS 2701.12 to bituminous coal of a particular calorific value (i.e., equal to or greater than 5,833 kcal/kg). J.A. 59-62, 141. Finally, the CIT sustained Commerce's surrogate-data selection for valuing coal tar pitch. J.A. 62-67.

On remand, Commerce once again selected Malaysia as the primary surrogate country, reasoning that Malaysian surrogate-value data were more specific to the inputs used and contemporaneous with the POR. J.A. 122-31; *see also* J.A. 93-135 (hereinafter "*Final Results of Redetermination Pursuant to Court Remand*" or "*Final Remand Results*"). However, because the Malaysian data did not include usable financial data, Commerce relied on a Romanian company's financial statements to calculate the surrogate financial ratios. *See* J.A. 107-08, 131. Commerce also considered Thai Chapter 27, Subheading Note 2 in its valuation of bituminous coal, as the CIT had directed, and

decided to value certain bituminous coal of a known calorific value using import data under Malaysian HS 2701.19 ("Other Coal," J.A. 142), and to value bituminous coal with unknown calorific value under *Romanian* HS 2701.12, because the average unit value for imports under Malaysian HS 2701.12 was "aberrantly high . . . and thus unreliable," J.A. 94; *see also* J.A. 113-22.

Appellants appealed once more. This time the CIT fully sustained Commerce's remand results. J.A. 136-59; *see also Carbon Activated Tianjin Co. v. United States*, 547 F. Supp. 3d 1310 (Ct. Int'l Trade 2021); J.A. 160-62 (*Certain Activated Carbon from the People's Republic of China*, 86 Fed. Reg. 60,203 (Dep't of Com. Nov. 1, 2021)). This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II

We apply the same standard of review as the CIT. *See Changzhou*, 975 F.3d at 1325. Therefore, we "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Although we review the decisions of the CIT de novo, we give great weight to the informed opinion of the CIT and it is nearly always the starting point of our analysis." *Changzhou*, 975 F.3d at 1325.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). We consider the entire record before the agency, including evidence that buoys and detracts from the agency's conclusion. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951). On substantial evidence review we do not reweigh the evidence. *See, e.g., SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018).

### III

Appellants press four issues on appeal.  We address each in turn.

### A

Appellants first argue that Commerce's selection of Malaysia as a primary surrogate country was unsupported by substantial evidence and contrary to law.  We disagree.

Commerce follows a four-step process in its selection of a surrogate country:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate countries that are at a comparable level of economic development to the [non-market economy] country; (2) Commerce identifies countries from the list with producers of comparable merchandise; (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (4) if more than one country satisfies steps (1)-(3), Commerce will select the country with the best factors data.

*Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016).  In implementing this process, Commerce's "valuation of the factors of production shall be based on the best available information regarding the values of such factors" in the surrogate country.  19 U.S.C. § 1677b(c)(1).  "Commerce has broad discretion to determine the best available information for an antidumping review." *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  "Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average,

and are contemporaneous with the period of review." *Jiaxing*, 822 F.3d at 1293.

Here, on remand from the CIT, Commerce selected Malaysia as the primary surrogate country, rejecting Appellants' contention that Romania was a superior choice. Commerce observed that while both Malaysia and Romania had "complete, publicly-available, and contemporaneous and input-specific" data, Malaysia had an HS subheading (HS 4402.90.1000) specific to coconut-shell charcoal, "a direct material that is consumed in significant quantities in the production of subject merchandise by the mandatory respondents." J.A. 106-07. Romania, by contrast, only had a broader HS subheading (HS 4402.90), which covered wood-based charcoal and nut-based charcoal, although nut-based charcoal is not used as an input by Carbon Activated or DJAC. J.A. 107. Commerce also found support for its decision to use Malaysian data because it appeared to be more contemporaneous with the POR. J.A. 128.

Commerce's selection of Malaysia as the primary surrogate country is supported by substantial evidence and not otherwise contrary to law. In reaching our conclusion, our task is to consider "not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing*, 822 F.3d at 1300-01. We are persuaded that Commerce considered the relevant factors and acted reasonably in selecting Malaysia.

Appellants argue that, instead, Romania should have been selected as the primary surrogate country because it had viable financial data and Commerce valued one of the main inputs, bituminous coal with an unknown calorific value, under Romanian HS 2701.12 (as we discuss below in III.D.). Due to shortcomings in Malaysian financial data, which did "not provide breakouts for raw material, labor, and energy," Commerce used a Romanian company's

financial statements for surrogate financial-ratio calculations. J.A. 107-08. This factor alone does not render Commerce's decision to select Malaysia arbitrary, capricious, or otherwise contrary to law. Indeed, Appellants point to no authority requiring Commerce to elevate financial data, or any factor, above all others in choosing a primary surrogate country, and we are aware of no such requirement. *See, e.g.*, *Xiamen Int'l Trade & Indus. Co. v. United States*, 953 F. Supp. 2d 1310, 1313 (Ct. Int'l Trade 2013) ("Commerce has not identified a hierarchy among these factors, and the weight accorded to a factor varies depending on the facts of each case.").

Appellants also argue that Malaysia's more specific coconut-shell charcoal HS subheading does not support Commerce's selection of Malaysia over Romania as a primary surrogate country. "Product-specific" surrogate values are, however, one factor Commerce explicitly considers in selecting a surrogate country. *See Jiaxing*, 822 F.3d at 1293. It was not arbitrary, capricious, or contrary to law for Commerce to have favored a surrogate country with more product-specific surrogate values.

Appellants further dispute Commerce's finding that the Malaysian data was more contemporaneous than the Romanian data. Appellants particularly highlight Commerce's use of Romanian data to value certain bituminous coal under HS 2701.12. Commerce reasoned that the Romanian data was not as specific to the POR, as it was labelled "2016-2018"[2] while the POR ran only between April

---

[2]    Appellants also assert that Commerce violated the prohibition of 19 U.S.C. § 1677m(d) against making adverse factual findings without providing Appellants notice and an opportunity to cure. We agree with the CIT that there was no such error. Section 1677m(d) applies to findings based on data provided *in response to* a request by

2017 and March 2018.  J.A. 128.  Appellants contend the labelling was the result of a technical glitch – but we agree with the CIT (J.A. 153-54) that the evidence on which they rely for this contention is not part of the administrative record, and "[o]ur review is limited to the record before Commerce in the particular review proceeding at issue." *Jiaxing*, 822 F.3d at 1297.

Thus, we hold that Commerce's selection of Malaysia as the primary surrogate country is supported by substantial evidence and is in accordance with the law.

B

Appellants next challenge Commerce's valuation of coal tar pitch using Malaysian import statistics for merchandise classified under HS 2708.10 ("Pitch from Coal and Other Mineral Tars," J.A. 62) rather than Russian import statistics under HS 2706.00 ("Coal Tar," J.A. 62).  In Appellants' view, this determination was not supported by substantial evidence.  Once more, we disagree.

Commerce preliminarily valued coal tar pitch using Malaysian import data under HS 2706.00.  J.A. 20.  In its *Final Results Memorandum*, however, Commerce found "that the Malaysian import data under HS 2708.10, constitute the best available information on the record to value the coal tar pitch . . . because HS 2708.10 is product-specific in that it is a provision for 'Pitch from Coal and Other Mineral Tars.'"  J.A. 21.  The CIT sustained Commerce's valuation, J.A. 67, while recognizing it was "a close call," J.A. 65.

---

Commerce and *not* to findings based on *data voluntarily submitted* on a respondent's own initiative, as occurred here.  *See Shenzhen Xinboda Indus. Co. v. United States*, 357 F. Supp. 3d 1295, 1304-05 (Ct. Int'l Trade 2018).

In coming to its conclusion, Commerce explained that the coal tar pitch used by Carbon Activated's supplier is often referred to simply as "pitch." J.A. 21. Commerce cited to "record evidence indicat[ing] that coal tar, through the fractionated distillation process, yields two different kinds of coal tar pitch." *Id.*; *see also* J.A. 483-84. Commerce then found that HS 2706.00 "covers *coal tar*, which is a by-product of the coke production process, whereas HS 2708.10 covers *pitch*, a product of the coal tar distillation process." J.A. 21 (emphasis added); *see also* J.A. 622 ("Coal-tars are by-products of the destructive distillation of coal, called carbonization or coking."). Commerce also had before it Carbon Activated's and DJAC's representations that "[t]his coal tar pitch is commonly known as 'pitch' in the industry." J.A. 1559. Collectively, this is substantial evidence for Commerce's conclusion.

Appellants correctly note that, in Administrative Reviews 10 and 12, Commerce valued coal tar pitch under HS 2706.00. But "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014). The record created in AR11 is different than the records Commerce had before it in connection with the prior and the subsequent administrative reviews. As long as Commerce adequately explains its conclusions, as it has done here, the fact that Commerce made different findings on different administrative records does not render Commerce's conclusions unsupported by substantial evidence, notwithstanding that Commerce reached different conclusions on the same issues in other proceedings.

Appellants are of the view that coal tar pitch containing only 61-72% pitch content must be classified under HS 2706.00 and that only coal tar pitch consisting of 100% pitch content can be classified under HS 2708.10. Appellants further contend that Malaysian import data under HS 2708.10 is unreliable and anomalous because of the

prevalence of Spanish imports in the data. In sustaining Commerce's valuation, the CIT determined, correctly, that Appellants failed to exhaust these arguments, which they were required to do. *See* J.A. 66-67; *see also* 28 U.S.C. § 2637(d) ("In any civil action not specified in this section, the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."). The CIT did not abuse its discretion in requiring exhaustion. *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017).

Therefore, we affirm the CIT's judgment sustaining Commerce's valuation of coal tar pitch.

C

Appellants also contend that Commerce's decision to use Malaysian import statistics for bituminous coal having a *known* calorific value, rather than Romanian import statistics, is unsupported by substantial evidence. On remand from the CIT, and applying Thai Note 2 to Malaysian HS 2701.12, Commerce valued Appellants' bituminous coal inputs with a known calorific value of less than 5,833 kcal/kg under Malaysian HS 2701.19. J.A. 122. While Commerce had found that Malaysian import data under HS 2701.12 was aberrant, it found that Malaysian import data under HS 2701.19 had not been shown to be unreliable. J.A. 117-20. The CIT sustained Commerce's decision. J.A. 148-50.

Appellants insist that because Commerce found import data under Malaysian HS 2701.12 to be unreliable, Commerce should not have used Malaysian HS 2701.19 to value bituminous coal with a known calorific value. Instead, in Appellants' view, Commerce should have used Romanian data for all bituminous-coal valuation to minimize distortion.

As part of their burden to persuade Commerce of the superiority of the Romanian data, Appellants needed to show that the Malaysian HS 2701.19 data was

aberrational or unreliable. *See QVD Food Co.*, 658 F.3d at 1324. Commerce's determination that Appellants failed to meet that burden is supported by substantial evidence. *See Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241, 1253-54 (Ct. Int'l Trade 2021); *see also Jinan Farmlady Trading Co. v. United States*, 228 F. Supp. 3d 1351, 1356-57 (Ct. Int'l Trade 2017) (concluding Commerce's determination that there was no aberrational data in the import statistics was reasonable when party failed to demonstrate "how any alleged distorted surrogate values resulted in inaccurate [normal value] or antidumping margins"). In finding Malaysian data under HS 2701.19 reliable, Commerce cited surrogate-value submissions from Calgon Carbon Corp. stating that "there is no indication that the [average unit value] is unusable as a result of being, for example, aberrantly high or based on a limited number of imports." J.A. 99 & n.28; J.A. 4396-4435.

Thus, we agree with the CIT that Commerce's decision to use Malaysian import statistics for bituminous coal having a *known* calorific value is supported by substantial evidence.

D

Finally, Appellants argue that Commerce's decision to value bituminous coal having an *unknown* calorific value using Romanian HS 2701.12, rather than by averaging import data under that subheading (i.e., Romanian HS 2701.12) *and* Romanian HS 2701.19, or by exclusively using Romanian HS 2701.19, is unsupported by substantial evidence. Once more, we disagree.

Commerce confronted a record lacking evidence of the calorific value of certain bituminous coal, which led Commerce to conclude that there was "no record evidence to support the use of Malaysian import [surrogate value] data under HS 2701.19 for the bituminous coal input," which is the subheading that Commerce applied to, and is applicable to, bituminous coal with a *known* calorific value of less

than 5,833 kcal/kg. J.A. 120. Under these circumstances, Commerce reasoned that "the plain language description of the GTA data for HS 2701.12 (Bituminous Coal, Not Agglomerated) . . . matches the mandatory respondents' descriptions of their input (*i.e.*, bituminous coal)." *Id.* Commerce further explained that, although Malaysia was the primary surrogate country, and therefore Commerce would have preferred to use Malaysian import data, Malaysian import data under HS 2701.12 was "aberrant and unreliable." J.A. 117-18. Therefore, Commerce relied on Romanian HS 2701.12 data instead.

Commerce's decision to value bituminous coal of an unknown calorific value under Romanian HS 2701.12 is supported by substantial evidence. We agree with the CIT that Commerce acted reasonably in deciding that HS 2701.12 applied because, in the absence of other information about the coal's calorific value, the subheading "Bituminous Coal, Not Agglomerated" accurately describes the input being valued. J.A. 146-47. Appellants point to nothing suggesting that "no reasonable mind" could have come to the same conclusion as Commerce. *See Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1344 (Fed. Cir. 2011) ("We cannot say, therefore that no reasonable mind could conclude that Commerce calculated the surrogate value as accurately as possible.").

The CIT has recognized Commerce's "strong preference to use surrogate values from the primary surrogate country." *Tri Union Frozen Prods., Inc. v. United States*, 227 F. Supp. 3d 1387, 1393 (Ct. Int'l Trade 2017); *see also* 19 C.F.R. § 351.408(c)(2) ("Except for labor, as provided in paragraph (d)(3) of this section, the Secretary normally will value all factors in a single surrogate country."). Just because Commerce departed here from what it "normally" does or "strongly prefer[s]" to do does not mean that what it did do is unsupported by substantial evidence.

Accordingly, we agree with the CIT that Commerce's decision to value bituminous coal with an *unknown* calorific value under Romanian HS 2701.12 is supported by substantial evidence.

## IV

We have considered Appellants' remaining arguments and find they are without merit. Therefore, we affirm the judgment of the CIT.

**AFFIRMED**