Slip Op. 14-115

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JIAXING BROTHER FASTENER CO., | |
| Plaintiffs, | |
| v. | Before: Leo M. Gordon, Judge |
| UNITED STATES, | Court No. 12-00384 |
| Defendant. | |

**OPINION**

[Remand results sustained.]

Dated: September 25, 2014

Gregory S. Menegaz, J. Kevin Horgan, and John J. Kenkel for deKieffer & Horgan, PLLC, of Washington, DC for Plaintiffs Jiaxing Brother Fastener Co., Ltd., aka Jiaxing Brother Standard Parts Co., Ltd., IFI & Morgan Ltd., and RMB Fasteners Ltd.

Carrie A. Dunsmore, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice for Defendant United States. With her on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Daniel J. Calhoun, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce of Washington, DC.

Frederick P. Waite and Kimberly R. Young for Vorys, Sater, Seymour and Pease LLP of Washington, DC for Defendant-Intervenor Vulcan Threaded Products Inc.

Gordon, Judge: This action involves the second administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering steel threaded rod from the People's Republic of China ("PRC"). See Certain Steel Threaded Rod from the People's Republic of China, 77 Fed. Reg. 67,332 (Dep't of Commerce Nov. 9, 2012) (final results second admin. review) ("Final Results"); see also

Issues and Decision Memorandum for Final Results of Second Administrative Review of Certain Steel Threaded Rod from the People's Republic of China, A-570-932 (Nov. 5, 2012), available at  http://enforcement.trade.gov/frn/summary/PRC/2012-27438-1.pdf (last visited this date) ("Decision Memorandum").  Before the court are the Results of Redetermination, ECF No. 39 ("Remand Results"), filed by Commerce pursuant to Jiaxing Brother Fastener Co. v. United States, 38 CIT ___, 961 F. Supp. 2d 1323 (2014) ("Jiaxing I").  Familiarity with the court's decision in Jiaxing I is presumed.  The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[1] and 28 U.S.C. § 1581(c) (2012).

Plaintiffs Jiaxing Brother Fastener Co., Ltd., aka Jiaxing Brother Standard Parts Co., Ltd., IFI & Morgan Ltd., and RMB Fasteners Ltd. (collectively, "Plaintiffs") challenge Commerce's continued selection of Thailand as the primary surrogate country.  For the reasons that follow, the court sustains Commerce's Remand Results.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2014). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2014).

## II. Discussion

In both the Final Results and the Remand Results, Commerce selected Thailand over the Philippines as the primary surrogate country and used Thai data to value all of Plaintiffs' factors of production. Commerce did so in part because it believed a Thai company called Capital Engineering Network Public Company Limited ("CEN") could serve as an adequate proxy for Plaintiffs' overhead, SG&A, and profit ratios. Plaintiffs contend that Commerce's use of CEN arbitrarily conflicts with Steel Wire Garment Hangers from the People's Republic of China, 77 Fed. Reg. 66,952 (Dep't of Commerce

Nov. 8, 2012) (prelim. results third admin. review) ("Wire Hangers"), a preliminary determination in a proceeding involving merchandise similar to steel threaded rod that Commerce issued one day prior to the Final Results contested here.  Pl.'s Comments on Remand Determ. 1-2, ECF No. 43 ("Pls.' Br.").

       In Wire Hangers, Commerce selected the Philippines over Thailand as the primary surrogate country because of concerns over the available Thai data, and in particular, problems it identified with a CEN financial statement.  Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review of Steel Wire Garment Hangers from the People's Republic of China, A-570-918, at 14-16 (Nov. 8, 2012), available at http://enforcement.trade.gov/frn/summary/prc/2012-27337-1.pdf (last visited this date) ("Wire Hangers Memorandum").  Specifically, based on that financial statement, Commerce found that CEN's principal business is investment, not manufacturing like the respondent.  Id. at 14-15.  Commerce also noted that only one of CEN's four subsidiaries produced wire, and that the record did not indicate whether that one subsidiary "draws wire from steel rod, [or] produces any downstream products from wire that can be considered comparable" to wire hangers.  Id. at 15.  By contrast, the Philippine financial statements on the Wire Hangers record suggested that those Philippine companies did manufacture comparable merchandise.  Commerce concluded that the Thai financial statements were "less appropriate" for calculating the respondent's financial ratios than the Philippine financial statements, and in turn selected the Philippines as the primary surrogate country.  Id. at 14-16.

Plaintiffs argue that Wire Hangers is "a highly comparable case" to this administrative review, and that "it is purely arbitrary and capricious for [Commerce] to now find in this case that [CEN] is comparable to steel wire processing companies like those that produce steel threaded rods (as opposed to wire hangers)." Pls.' Br. at 1, 8. Plaintiffs' reasoning is straightforward. Given that wire hangers and steel threaded rod can both be produced from steel wire rod, how could Commerce find that CEN's wire subsidiary produces merchandise comparable to steel threaded rod but not merchandise comparable to wire hangers? How could Commerce also suggest that CEN's business is too diverse to be an adequate financial surrogate for a wire hanger manufacturer but not too diverse to be an adequate financial surrogate for a steel threaded rod manufacturer? Most importantly, how can CEN be an adequate proxy for any manufacturer if its principal business is investment? See Pls.' Br. at 2-12.

The court in Jiaxing I agreed that the Final Results appeared to contradict Commerce's contemporaneous position in Wire Hangers as well as Commerce's own financial surrogate selection criteria. Jiaxing I, 38 CIT at ___, 961 F. Supp. 2d at 1332. In the Remand Results, Commerce now offers a detailed explanation of why the record in this review supports a conclusion it could not draw from the record in Wire Hangers:

> While the Department expressed concern in Hangers regarding the comparability of the financial statements for the same Thai company at issue in this review (albeit for a different year), in that case we were considering the manufacturing process for steel wire garment hangers, not steel threaded rod. Unlike in Hangers, the record in this case reflects that the Thai company, [CEN], produces prestressed concrete wire. Specifically, CEN's financial statements indicate that its business involves "Manufacturing and distributing prestressed concrete wire, prestressed concrete strand wire and welding wire." In the original antidumping duty investigation of steel threaded rod from the PRC, the Department found that

downstream products of wire rod that are drawn from wire rod are comparable merchandise to steel threaded rod.

Further, the Department was concerned, in part, in Hangers that the Thai company produced non-comparable merchandise as well as comparable merchandise. After review the record in this case, the Department found that the Philippine companies, like the Thai company, all produce non-comparable merchandise, as well as comparable merchandise. Specifically, APO Industries, Inc. produces nails, but also produces piano hinges; Benedicto Steel Corporation produces prestressed concrete wire and nails, but also produces tin plate, metal screen, pots and other non-comparable merchandise; and Sterling Steel Incorporated produces nails, but also produces other non-comparable hardware goods such as iron pipes and wire netting.

. . . .

. . . With respect to the concern expressed in Hangers that CEN is a holding company, the Department examined the record of this case and acknowledged that CEN's statements are consolidated statements, and that the wire subsidiary produces comparable merchandise. However, while the RMB/IFI Group claims that the Philippine companies primarily produce comparable merchandise and only produce a few non-comparable products, and therefore are in no way similar to CEN, the RMB/IFI Group provided no record evidence (such as information within the companies' financial statements listing revenue by specific products) to demonstrate the percentage of comparable versus non-comparable merchandise produced or sold by these Philippine companies as compared to CEN. Therefore, record evidence does not demonstrate that the Philippine companies are more representative of respondents' production experience than the Thai company. An examination of the actual financial ratios themselves further confirms that the financial ratios from the CEN statements are not dissimilar to the ratios from the Philippine companies as the RMB/IFI Group suggests.

With respect to the concern expressed in Hangers that CEN did not draw steel wire rod, the Department's analysis in that case was focused on the manufacturing process for steel wire garment hangers, not steel threaded rod. The analysis criteria in Hangers cannot be indiscriminately applied to this case without consideration to differences in inputs and production processes. The scope of steel threaded rod covers products not only drawn from wire rod but also round bar. Unlike Hangers, for the producers of steel threaded rod, the main inputs consumed in the production process can either be wire rod or round bar depending on the gauge of steel threaded rod produced. Moreover, in Hangers, the discussion of consumption of wire

rod is an element of the Department's analysis of any differences in the level of integration between the respondents and the potential surrogate companies. Such analysis is necessarily specific to that record. Hence, the RMB/IFI Group's argument solely relying on consumption of wire rod in determining comparability is not appropriate for steel threaded rod.

More to the point, the case history of steel threaded rod proceedings addresses this concern. In the original antidumping duty investigation of steel threaded rod from the PRC, while the Department initially rejected the financial statements of an Indian company Rajratan Global Wire Ltd. ("Rajratan") based on the belief that Rajratan did not produce downstream products of wire rod, the Court remanded that decision to the Department. On remand, the Department found that Rajratan did produce comparable products to steel threaded rod based on the evidence that Rajratan produced prestressed concrete wire and tyre bead wire. As a result, the Department included the financial statements of Rajratan in the calculation of financial ratios, which the Court sustained. In this administrative review of the same order, CEN's financial statements indicate its business involves "Manufacturing and distributing prestressed concrete wire, prestressed concrete strand wire and welding wire." Because the Department, with the Court's approval, previously determined in an earlier segment of this proceeding that prestressed concrete wire is comparable merchandise to steel threaded rod, it is appropriate to use CEN's financial statements and Thai data in general in this administrative review.

Remand Results at 6-7, 14-16 (footnotes omitted).

In short, as Commerce explains, the record and circumstances of this administrative review are not so similar to Wire Hangers as to require the same result. The CEN data at issue in this review is not the same as the CEN data in Wire Hangers. Remand Results at 6. The Wire Hangers review focused on a CEN financial statement from 2011 whereas this record features a CEN annual report from 2010. Defendant-Intervenor clarifies that the 2010 annual report on this record includes CEN's 2010 financial statement as well as extra details about the operations of CEN's subsidiaries. Def.-Intervenor's Resp. Br. 3-6 & n.1, ECF No. 44. Commerce also explains that steel threaded rod and wire hangers do not have identical manufacturing processes or inputs.

As a consequence, although the Wire Hangers record did not support a finding that CEN's wire subsidiary produced merchandise comparable to wire hangers, Wire Hangers Memorandum at 14-15, Commerce here can and does show that CEN's wire subsidiary produces prestressed concrete wire, a product that Commerce previously found to be comparable to steel threaded rod. Remand Results at 6, 15-16. Further, unlike the Philippine financial data on the record in Wire Hangers, the Philippine financial statements here carry one of the same critical shortcomings as the CEN data. Each Philippine company on this record produces non-comparable merchandise to some degree, just like CEN. Id. at 6-7, 14-15. Commerce reasonably explains why these differences merit a different surrogate country choice in this review than the choice it made in Wire Hangers.

Although Commerce reasonably explained its different choices here than in Wire Hangers, Plaintiffs' other arguments challenging the adequacy of the available Thai surrogate data do test the reasonableness of selecting Thailand as the primary surrogate country.[2] As Plaintiffs explain, Commerce has a stated preference is to use multiple financial statements to calculate surrogate financial ratios. Here, the record contains only one Thai source, the 2010 CEN annual report, as opposed to three usable Philippine sources. Plaintiffs also show that CEN's income derives from its ownership of numerous other companies, not manufacturing, and that only one of CEN's four subsidiaries produces comparable merchandise. Pls.' Br. at 2-7. To this extent, the CEN data on this

---

[2] Among its other objections to the adequacy of CEN as a financial surrogate, Plaintiffs assert that CEN's wire-producing subsidiary is operating at a loss. Pls.' Br. at 7-8. As Defendant correctly explains, however, this argument is not properly before the court because Plaintiffs failed to raise it at any point during proceedings at Commerce. See Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1383-84 (Fed. Cir. 2008).

record does appear to present some of the same problems undercutting CEN's "suitability for calculating financial ratios" that Commerce expressed in <u>Wire Hangers</u>. <u>Wire Hangers Memorandum</u> at 14-16. Moreover, as Plaintiffs argue, financial ratios have in some instances proved determinative in the selection of a surrogate country. <u>See id.</u> at 10-12 (citing <u>Certain Steel Nails from the People's Republic of China</u>, 78 Fed. Reg. 16,651 (Dep't of Commerce Mar. 18, 2013) (final results third admin. review)). Plaintiffs also repeat the same persuasive arguments that led the court in <u>Jiaxing I</u> to observe that the Philippine hydrochloric acid ("HC1") data "simultaneously appear to undermine the reasonableness of relying on Thai import statistics and offer an apparently better means of valuing Plaintiffs' [HC1] input." <u>Jiaxing I</u>, 38 CIT at ___, 961 F. Supp. 2d at 1334.

In remanding the <u>Final Results</u>, the court in <u>Jiaxing I</u> questioned how Commerce could reasonably select Thailand despite problems with the Thai financial and HC1 data and despite the apparent superiority of alternative Philippine data on the record. <u>Id.</u> at ___, 961 F. Supp. 2d at 1334-45. In response, Commerce now explains why it believes other advantages in the Thai surrogate data outweigh these shortcomings:

> When multiple different factors regarding data quality are present in evaluating SVs from various countries, the Department must weigh the balance of the evidence. Given that steel threaded rod is a type of steel fastener drawn from steel wire rod or steel round bar, in this case, these steel inputs are the most important FOPs to consider in the proper valuation of steel threaded rod. In fact, <u>nearly all of the manufacturing costs were derived from the main steel inputs, and consist of a large majority of the NV</u>. In circumstances where the importance of one input dominates all other inputs, the Department will take into consideration the significant impact that the primary input has on NV, when considering the overall data quality of one surrogate country versus another. As noted in the <u>Final Results</u>, Thai import data for steel wire rod provide for specific grades of steel based on carbon content that can be matched to the grade of steel wire rod consumed by the RMB/IFI Group, whereas Philippine import data provide broad

categories that are not as specific to the steel wire rod consumed by the RMB/IFI Group. Moreover, in this review, the Department can value all FOPs with the available Thai data set whereas the Philippine data set are missing packing materials including polyethylene bag, plastic cap, carton, paper tube and staples. Therefore, it is reasonable for the Department to find that the totality of facts in this review lead to a different conclusion in selecting Thailand as the primary surrogate country as compared to the decision the Department made in Hangers. In this review, the superior quality of Thai data for the main input, steel wire rod, outweighs any other strengths contained in the Philippine data (i.e., more financial statements, or the alleged superiority of the data for HC1, which the Department disputes).

Based on the discussions above, having examined the quality of financial statements and the quality of HC1 import data from the Philippines, in view of the totality of the facts, the Department continues to find that Thailand offers better surrogate data to value the RMB/IFI Group's FOPs overall. In determining the appropriate SVs, the Department strongly favors selecting all SVs from a single country, pursuant to 19 CFR 351.408(c)(2). The Department will only introduce data from a secondary surrogate country into the calculation if there were no primary SV, or if the primary SV was unreliable based on record evidence. As the Department continues to find Thailand to be the appropriate primary surrogate country, the Department finds that Thai financial statements and HC1 import statistics constitute the best available information because they meet the Department's criteria in selecting SVs and are from the primary surrogate country, with no evidence demonstrating that they are aberrant or otherwise unreliable.

. . . .

As explained above, in Hangers, the Department's decision in selecting the Philippines was not based on financial statements alone. While the Department generally finds that financial ratios are critical and sometimes decisive in the selection of primary surrogate country, this is not always the case. As discussed above, the Department considers several criteria and makes a primary surrogate country determination based on the totality of circumstances. Here, the Court explicitly asked the Department to consider whether Thailand's apparently more specific steel input data outweighs the apparent comparative strengths of the Philippine HC1 and financial data. Based on the analysis above, the superior quality of Thai data for the main input, steel wire rod, outweighs any other strengths contained in the Philippine data, with the result that the overall accuracy of the calculation is best enhanced by reliance on a more specific steel surrogate value than on the financial statements or the Philippine HC1 surrogate value. To do

otherwise as suggested by the RMB/IFI group would ignore the totality of the evidence in this case and lead to a less accurate result. . . . In re-weighing the totality of the evidence in this case, the Department once again arrives at the conclusion that Thailand best serves as the primary surrogate country.

Remand Results at 11-12, 16-17 (emphasis added, footnotes omitted).

Commerce has a regulatory preference is to "value all factors [of production] in a single surrogate country," 19 C.F.R. § 351.408(c)(2) (2014), as well as a policy "to only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."  Issues and Decision Memorandum for the Final Results of the Second Administrative Review of Sodium Hexametaphosphate from the People's Republic of China, A-570-908, at 4 & n.15 (Sept. 19, 2012), available at http://enforcement.trade.gov/frn/summary/prc/2012-23832-1.pdf (last visited this date). The administrative record contained available, but imperfect, surrogate data for all major inputs sourced from both Thailand and the Philippines, including Thai and Philippine steel import data.  When comparing the carbon content of steel contained in the Thai and Philippine import data to the carbon content of the steel wire rod input Plaintiffs actually used, however, Commerce found that the Thai data turned out to be more specific to Plaintiffs' steel inputs than the Philippine data.  And as Commerce detailed in a business proprietary memorandum it produced during the remand proceedings and summarized in the Remand Results, the steel input accounts for almost all of Plaintiffs' manufacturing costs and most of Plaintiffs' normal value.  Remand Results at 11 (citing Contribution of FOPs to the Calculation of Normal Value at 1 (Dep't of Commerce Mar. 28, 2014)).  Due to the steel input's outsized impact on Plaintiffs' normal value, Commerce reasonably

prioritized that input in making its surrogate country selection.  The Thai steel data's superior quality therefore supports Commerce's choice of Thailand as the primary surrogate country and Commerce's use of Thai data to calculate Plaintiffs' normal value.

Commerce's rationale for why it would tolerate relative weaknesses in the Thai financial and HC1 data makes sense.  Neither input influences Plaintiffs' normal value nearly as much as the steel input, meaning a reasonable mind could conclude as Commerce did that "the overall accuracy of the calculation is best enhanced by reliance on a more specific steel surrogate value than on the financial statements or the Philippine HC1 surrogate value."  Remand Results at 16; see generally Lifestyle Enter., Inc. v. United States, 751 F.3d 1371, 1378 (Fed. Cir. 2014) ("Because Commerce reasonably chose one of two imperfect data sets, the Trade Court erred in substituting its own judgment for Commerce's.").  A reasonable mind could likewise conclude that Commerce's regulatory preference to value all inputs from a single surrogate country favors using Thai data to value all of Plaintiffs' inputs despite some apparent relative superiority of the Philippine financial and HC1 data.

The court sustains Commerce's reasonable selection of Thailand as the primary surrogate country and use of Thai data to calculate Plaintiffs' normal value.  Judgment will be entered accordingly.

                                                          /s/ Leo M. Gordon
                                                        Judge Leo M. Gordon

Dated:   September 25, 2014
             New York, New York