# United States Court of Appeals for the Federal Circuit

---

**JIAXING BROTHER FASTENER CO., LTD., AKA JIAXING BROTHER STANDARD PARTS CO., LTD., AKA RMB FASTENERS LTD., AKA IFI & MORGAN LTD.,**
*Plaintiff-Appellant*

v.

**UNITED STATES, VULCAN THREADED PRODUCTS, INC.,**
*Defendants-Appellees*

---

2015-1161

---

Appeal from the United States Court of International Trade in No. 1:12-cv-00384-LMG, Judge Leo M. Gordon.

---

Decided: April 21, 2016

---

GREGORY S. MENEGAZ, DeKieffer & Horgan, PLLC, Washington, DC, argued for plaintiff-appellant. Also represented by JOHN J. KENKEL, JAMES KEVIN HORGAN, ALEXANDRA H. SALZMAN.

ALEXANDER V. SVERDLOV, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by ELIZABETH ANNE

SPECK, BENJAMIN C. MIZER, JEANNE E. DAVIDSON, PATRICIA M. MCCARTHY; LISA W. WANG, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

FREDERICK PAUL WAITE, Vorys, Sater, Seymour & Pease LLP, Washington, DC, argued for defendant-appellee Vulcan Threaded Products, Inc. Also represented by KIMBERLY YOUNG.

---

Before O'MALLEY, REYNA, and CHEN, *Circuit Judges.*

REYNA, *Circuit Judge.*

Appellants appeal a decision of the U.S. Court of International Trade that affirmed a U.S. Department of Commerce determination to select Thailand as the surrogate country for China in the second administrative review of an antidumping duty order on certain steel threaded rod from China.[1]  We hold that the U.S. Department of Commerce decision to use surrogate values from Thailand to value certain factors of production in calculating normal value for the subject merchandise was in accordance with law, not arbitrary or capricious, and supported by substantial evidence.  We *affirm.*

## BACKGROUND

Appellants are Jiaxing Brother Fastener Co., Ltd. (aka Jiaxing Brother Standard Parts Co., Ltd.), IFI & Morgan Ltd., and RMB Fasteners Ltd. (collectively, "Appellants" or "Jiaxing").  Jiaxing Brother Fastener Co.,

---

[1]    *Certain Steel Threaded Rod from the People's Republic of China:  Final Results and Final Partial Rescission of Antidumping Duty Administrative Review; 2010–2011*, 77 Fed. Reg. 67,332, 67,333 (Dep't of Commerce Nov. 9, 2012).

Ltd. is a Chinese manufacturer of steel threaded rod, while IFI & Morgan Ltd. and RMB Fasteners Ltd. are Chinese exporters of the steel threaded rod produced by Jiaxing Brother Fastener Co., Ltd. Appellants are affiliated parties. J.A. 8. Appellants challenge the U.S. Department of Commerce ("Commerce") decision to select Thailand as the surrogate country to establish normal value in the second administrative review of the antidumping duty order on certain steel threaded rod from China. *See Certain Steel Threaded Rod from the People's Republic of China: Notice of Antidumping Duty Order*, 74 Fed. Reg. 17,154 (Dep't of Commerce Apr. 14, 2009).

In antidumping proceedings involving nonmarket economy countries, such as China, the Tariff Act requires Commerce to calculate normal value of the subject merchandise based on surrogate values offered in a comparable market economy. *See* 19 U.S.C. § 1677b(c)(1). Commerce calculates the surrogate values by valuing certain "factors of production" used in producing the merchandise in a comparable market economy.[2] *Id.* § 1677b(c)(4). In essence, Commerce seeks to construct a hypothetical normal value for the merchandise that is uninfluenced by the nonmarket economy. *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999); *see also* 19 U.S.C. § 1677(18)(A) (defining "nonmarket economy country"). To do this, Commerce selects a market economy country as the primary surrogate country. 19 C.F.R. § 351.408(c)(2). The process of choosing a market economy country to value the factors of production is known as surrogate country selection. *See*

---

[2]    The factors of production "include, but are not limited to . . . hours of labor required, . . . quantities of raw materials employed, . . . amounts of energy and other utilities consumed, and . . . representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3).

*Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010).

As early as 2004, Commerce has followed a four-step process to select a surrogate country:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate countries that are at a comparable level of economic development to the [non-market economy] country; (2) Commerce identifies countries from the list with producers of comparable merchandise; (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (4) if more than one country satisfies steps (1)–(3), Commerce will select the country with the best factors data.

*Vinh Hoan Corp. v. United States*, 49 F. Supp. 3d 1285, 1292 (Ct. Int'l Trade 2015) (internal quotation marks omitted) (quoting Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), http://enforcement.trade.gov/policy/bull04-1.html (last visited Feb. 11, 2014)).

The statute directs Commerce to value the factors of production through "the best available information" in the market economy. 19 U.S.C. § 1677b(c)(1). We have noted that Commerce has discretion to determine what constitutes the best available information, as this term is not defined by statute. *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011). "Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014).

Using the best available information, Commerce "*shall* [value the factors of production] to the extent possible . . . in one or more market economy countries that are—(A) at a level of *economic* development comparable to that of the nonmarket economy country, *and* (B) significant *producers* of comparable merchandise." § 1677b(c)(4)(A)–(B) (emphases added). The statute does not define "comparable"; nor does it require Commerce to use any particular methodology in determining which countries are sufficiently comparable. To partially fill the statutory gap, Commerce promulgated 19 C.F.R. § 351.408(b), which emphasizes per capita Gross Domestic Product ("GDP") as a measure of economic comparability:

> In determining whether a country is at a level of economic development comparable to the non-market economy under [19 U.S.C. § 1677b(c)(1)(B)] or [19 U.S.C. § 1677b(c)(4)(A)] of the Act, the Secretary will place primary emphasis on per capita GDP as the measure of economic comparability.

19 C.F.R. § 351.408(b).

At least by 2007, Commerce began relying on per capita Gross National Income ("GNI"), as opposed to per capita GDP, for determining sufficiently comparable countries. According to Commerce, "while the two measures are very similar, per capita GNI is reported across almost all countries by an authoritative source (the World Bank)," and Commerce "believes that the per capita GNI represents the single best measure of a country's level of total income and thus level of economic development." *Vinh Hoan*, 49 F. Supp. 3d at 1293 n.5 (quoting *Antidumping Methodologies in Proceedings Involving Non-Market Economy Countries: Surrogate Country Selection and Separate Rates*, 72 Fed. Reg. 13246, 13246 n.2 (Dep't of Commerce Mar. 21, 2007)).

Following its preference to use one surrogate country as the reference point, 19 C.F.R. § 351.408(c)(2), when several countries are both at a level of economic development comparable to the nonmarket economy country and significant producers of comparable merchandise, Commerce evaluates the reliability and completeness of the data in the similarly-situated surrogate countries and generally selects the one with the best data as the primary surrogate country.[3]

In April 2008, Commerce instituted the underlying antidumping duty investigation on certain steel threaded rod from China.[4] In April 2009, Commerce made a final affirmative determination that a U.S. industry was materially injured by sales at less-than-fair value of the merchandise subject to the scope of the investigation.[5] In 2009, Commerce issued an antidumping duty order on the

---

[3]    *See* Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), http://enforcement.trade.gov /policy/bull04-1.html (last visited Jan. 21, 2016) ("[D]ata quality is a critical consideration affecting surrogate country selection. After all, a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate if crucial factor price data from that country are inadequate or unavailable.").

[4]    *See Steel Threaded Rod from the People's Republic of China:  Initiation of Antidumping Duty Investigation*, 73 Fed. Reg. 17,318–23 (Dep't of Commerce Apr. 1, 2008).

[5]    *See Certain Steel Threaded Rod from the People's Republic of China:  Notice of Antidumping Duty Order*, 74 Fed. Reg. 17,154 (Dep't of Commerce Apr. 14, 2009).

subject merchandise.[6]  For purposes of both the preliminary and final determinations, Commerce selected India as the surrogate country on which to base the Chinese producers' factors of production.[7]  Appellants were respondents in the investigation and were assigned antidumping duty rates of 55.16%.[8]

The Second Administrative Review

On May 27, 2011, Commerce initiated a second administrative review for the period of review from April 1, 2010, though March 31, 2011.[9]  The second administrative review is the subject of this appeal.

At the outset of the second administrative review, Commerce proposed seven countries as potential surrogate countries on the basis that they had a per capita GNI close to China:

| Country | Per Capita GNI, 2010 (USD) |
| --- | --- |
| China | $4,260 |
| | |
| Philippines | $2,050 |
| Indonesia | $2,580 |
| Ukraine | $3,010 |
| Thailand | $4,210 |

---

[6]  *See Certain Steel Threaded Rod from the People's Republic of China:  Notice of Antidumping Duty Order*, 74 Fed. Reg. 17,154 (Dep't of Commerce Apr. 14, 2009).

[7]  *See Certain Steel Threaded Rod from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 74 Fed. Reg. 8907, 8909 (Dep't of Commerce Feb. 27, 2009).

[8]  *See Certain Steel Threaded Rod From the People's Republic of China: Notice of Antidumping Duty Order,* 74 Fed. Reg. 17,154, 17,156 (Apr. 14, 2009).

[9]  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 76 Fed. Reg. 30,912 (Dep't of Commerce May 27, 2011).

| Peru | $4,710 |
| Columbia | $5,510 |
| South Africa | $6,100 |

J.A. 28–29. With a per capita GNI of $1,340, India was not included on the list. J.A. 27–29.[10]

After publishing the list of surrogate country candidates, Commerce invited interested parties to comment on the selection of an appropriate surrogate country for China.[11]    Vulcan Threaded Products, Inc. ("Vulcan") submitted data from Thailand, arguing that Thailand was the best choice. Jiaxing urged Commerce to use India as the surrogate country.[12]  J.A. 61–62, 821. Of the additional countries proposed by other parties, none were within the per capita GNI range noted on the list. J.A. 25, 821, 1384–85.

In its April 2012 preliminary decision on the second administrative review, Commerce selected Thailand as the most appropriate market economy to act as the surrogate country to China. J.A. 811–35.[13] Commerce evalu-

---

[10]   *Memorandum, Antidumping Duty Order on Certain Steel Threaded Rod from the People's Republic of China* (Dep't of Commerce Nov. 18, 2011).

[11]   *See* J.A. 821; *Certain Steel Threaded Rod From the People's Republic of China:  Preliminary Results of Administrative Review, Intent to Rescind, and Rescission, in Part*, 77 Fed. Reg. 27,022, 27025 (Dep't of Commerce May 8, 2012).

[12]   *See* J.A. 61–64; *Second Administrative Review of Steel Threaded Rod from China:  Petitioner's Comments on Surrogate Country Selection* (Feb. 3, 2012).

[13]   *See* J.A. 821; *Certain Steel Threaded Rod From the People's Republic of China:  Preliminary Results of Administrative Review, Intent to Rescind, and Rescission,*

ated Global Trade Atlas ("GTA") data and determined that all countries on the surrogate country list exported significant quantities of steel threaded rod and could be considered significant producers of comparable merchandise. J.A. 820–21. After considering the reliability and availability of surrogate value data, Commerce chose Thailand as the primary surrogate country because the Thai information on record was "complete," allowing Commerce to value material inputs, energy, movement expenses, and financial ratios. J.A. 821–22. To value financial ratios, Commerce used the 2010 annual report of the Thai company Capital Engineering Network Public Company Limited ("CEN"). J.A. 821–22, 828–43. To value the steel and hydrochloric acid ("HCl") inputs, Commerce used Thai GTA import statistics. J.A. 824–25, 838–41. Commerce did not consider India as a surrogate country because the Indian data was less economically comparable to China than the Thai data. J.A. 820–21.

Following the preliminary decision, Jiaxing submitted briefing, arguing that Commerce should use India as the primary surrogate country, with the Philippines as an alternative to India. J.A. 1384–85.

On November 9, 2012, Commerce published the final results of the second administrative review, selecting Thailand as the surrogate country.[14] J.A. 1, 1384–94. Commerce again explained that India's per capita GNI was not at a level of economic development comparable to China. J.A. 1385–87. As between Thailand and the

*in Part*, 77 Fed. Reg. 27,022 (Dep't of Commerce May 8, 2012).

[14] *Certain Steel Threaded Rod from the People's Republic of China: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review; 2010–2011*, 77 Fed. Reg. 67,332, 67,333 (Dep't of Commerce Nov. 9, 2012).

Philippines, observing that both countries were significant producers of comparable merchandise, Commerce determined that the Thai data was the best available information on record. J.A. 1387–88. Commerce explained that the cost of steel wire rod was the factor with the greatest significance and impact on normal value. According to Commerce, the Thai information was the most specific data available for this critical factor. J.A. 1389.

Procedural History

On November 28, 2012, Jiaxing appealed the final results to the Court of International Trade ("Trade Court"), arguing that Commerce erred in selecting Thailand as the primary surrogate country over India and the Philippines. J.A. 1441.

On February 6, 2014, the Trade Court affirmed Commerce's exclusion of India as a potential surrogate country, but remanded for clarification on the basis for selecting Thailand as the surrogate country. *Jiaxing Brother Fastener Co. v. United States* (*Jiaxing I*), 961 F. Supp. 2d 1323, 1335 (Ct. Int'l Trade 2014). The Trade Court found that India did not satisfy Commerce's requirements for economic comparability. *Id.* at 1329–32. Comparing India's per capita GNI of $1,340 against China's per capita GNI of $4,260, the Trade Court concluded that "it is difficult to envision how India would have been a reasonable or defensible choice on this administrative record." *Id.* at 1329. Taken together, "Commerce's only real choice was not between India and Thailand, but between Thailand and the Philippines." *Id.* at 1332. The Trade Court remanded for reconsideration of Commerce's selection of Thailand over the Philippines. *Id.* at 1332–35. Although the Trade Court found the Thai data "apparently more specific," the Trade Court determined that Commerce had not adequately explained whether the more specific Thai input data on steel out-

weighed the "apparent comparative strengths" of the Philippine data on financial statements and HCl. *Id.* at 1334–35. The Trade Court further instructed Commerce to reassess its preference for using a single surrogate country to source all data to calculate normal value. *Id.*

On May 9, 2014, Commerce again found on remand that Thailand offered superior data for calculating normal value.[15] J.A. 1422–40. Commerce observed that both the Philippines and Thailand offered financial statements that met its administrative requirements. J.A. 1424–27. Commerce also found that both the Philippine and Thai data for HCl were specific, contemporaneous, and reliable. J.A. 1427–32. Noting the parity between the two candidate countries, Commerce emphasized the importance of steel wire rod:

> Given that steel threaded rod is a type of steel fastener drawn from steel wire rod or steel round bar, in this case, these steel inputs are the most important [factors of production] to consider in the proper valuation of steel threaded rod. In fact, nearly all manufacturing costs were derived from the main steel inputs, and consist of a large majority of the [normal value].

J.A. 1432. Because one input dominated Jiaxing's factors of production, Commerce found that the Thai steel data was superior and outweighed any weakness in the Thai financial statements or HCl input data. J.A. 1432. Jiaxing appealed Commerce's remand redetermination.

On September 25, 2014, the Trade Court affirmed the remand redetermination. *Jiaxing Brother Fastener Co. v. United States* (*Jiaxing II*), 11 F. Supp. 3d 1326, 1333 (Ct.

---

[15] *Results of Redetermination Pursuant to* Jiaxing Brother Fastener Co., Ltd. v. United States *Court No. 12-00384, Slip Op. 14-12 (February 6, 2014)* (May 9, 2014).

Int'l Trade 2014). The Trade Court reasoned that the cost of steel wire rod drove almost the entire value of steel threaded rod and that the Thai financial information provided by CEN was representative of Jiaxing's financial ratios. *Id.* at 1330–32. Reviewing Commerce's selection of Thailand over the Philippines, the Trade Court determined that the Thai import data identified specific grades of steel with varying carbon content that could be matched to the low-carbon grade of steel used by Jiaxing, while the Philippine import data provided broader categories that were not as specific. *Id.* at 1330–32. The Thai data also provided values for all factors of production, whereas the Philippine data set was missing certain values. *Id.* at 1333.

Jiaxing appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(5) (2012).

STANDARD OF REVIEW

We review Trade Court decisions de novo, applying the same standard used by the Trade Court when reviewing Commerce decisions. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1373 (Fed. Cir. 2015) (citation omitted). Under that standard, we will uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "more than a mere scintilla" and amounts to what a "reasonable mind might accept as adequate to support a conclusion." *Downhole*, 776 F.3d at 1374 (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). Our review is limited to the record before Commerce in the particular review proceeding at issue and includes all "evidence that supports and detracts" from Commerce's conclusion. *Sango Int'l L.P. v. United States*, 567 F.3d 1356, 1362 (Fed. Cir. 2009). An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be

drawn from the evidence. *Downhole*, 776 F.3d at 1374 (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)).

We review de novo whether Commerce erred in interpreting a governing statute. *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 763 (Fed. Cir. 2012) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).[16]

## DISCUSSION

Jiaxing argues that Commerce's choice of Thailand as the surrogate country over India and the Philippines was erroneous on three distinct grounds.[17]    *First*, Jiaxing

---

[16]    Although the parties agree that the statute at issue is clear, they disagree as to whether Commerce's interpretation conflicts with the statute's express terms. Because the parties do not argue that the statutory language is ambiguous, we assume, without deciding, that the language is unambiguous. Accordingly, in this case, we address whether Commerce gave "effect to the unambiguously expressed intent of Congress," a review conducted without affording deference to the agency. *Chevron*, 467 U.S. at 842.

[17]    At the outset, we consider the government's contention that Jiaxing waived two issues on appeal. First, the government argues that Jiaxing failed to argue before the Trade Court that Commerce erred in not addressing production comparability when selecting the preliminary list of surrogate country candidates. Second, the government argues that Jiaxing did not address below its transparency/consistency concerns as to the shift away from India as a surrogate country to China. Jiaxing counters that those issues are subject to this appeal because they stem from the findings and conclusions in *Jiaxing I* and *Jiaxing II*, some of which could not be raised until now.

argues that Commerce's decision to exclude India reflects erroneous interpretations of the antidumping statute and findings not supported by substantial evidence. *Second*, Jiaxing contends that the selection of Thailand was arbitrary and capricious because India has traditionally served as the surrogate country, and there is no legal basis for Commerce to depart from its long-standing practice. *Third*, Jiaxing asserts that the selection of Thailand is not supported by substantial evidence. We take each argument in turn.

### Commerce's Decision to Exclude India

We first address whether Commerce's decision to not consider India as a potential surrogate country is based on a permissible construction of the statute. As noted above, neither party argues that the statute is ambiguous. We therefore are left to determine whether Commerce's decision to not consider India as a surrogate country (or a surrogate country candidate) conflicts with the statute's express terms. *See United States v. Eurodif S.A.*, 555 U.S. 305, 322 (2009).

---

Reviewing the decisions below, we find that those issues are subsumed in the arguments below and appear properly before us because Jiaxing asserted that the underlying statute was interpreted and applied erroneously to exclude India from consideration as a surrogate country candidate. We do, however, agree with the government's contention that Jiaxing waived another argument on appeal—its argument that Commerce set forth the GNI band width without any reasoned explanation for its choice. As the government points out, Jiaxing failed to make this argument during the administrative and trial proceedings, and we decline to consider it for the first time on appeal.

We discern nothing in the statute that requires Commerce to consider any particular country as a surrogate country. When Congress does not mandate a procedure or methodology for applying a statutory test, "Commerce may perform its duties in the way it believes most suitable." *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1364 (Fed. Cir. 2015) (internal quotation marks and citation omitted). Here, Commerce has provided reasoned analysis in support of its surrogate country determination, which we find to be supported by substantial evidence.

## Commerce's Selection of Thailand over India

We next consider Jiaxing's assertion that Commerce has a long and established practice of using India as a surrogate country and that its selection of Thailand was contrary to law and unsupported by substantial evidence. Jiaxing notes that India has been a surrogate country to China for nearly three decades. To suddenly not include India on the list of alternative surrogate countries demonstrates, in Jiaxing's view, a lack of transparency and an inconsistency with Commerce's past practices, which in turn causes a lack of predictability for nonmarket respondents. In *Clearon*, Jiaxing argues, the Trade Court remanded for reconsideration of the proper surrogate country because Commerce, with no justification, departed from its past practices by not identifying India as a candidate. *See Clearon Corp. v. United States*, 36 I.T.R.D. (BNA) 788, 2014 Ct. Intl. Trade LEXIS 88, at *23 (Ct. Int'l Trade July 24, 2014) ("The need for an agency to adequately address a departure from past practice is a compelling justification for a remand request."). According to Jiaxing, *Clearon* demonstrates the influential role that India has played over the years as a surrogate to China. We disagree that Commerce is forever bound by its past practices.

The record demonstrates that Commerce considered Jiaxing's arguments that favored India, and that its rejection of them during the second administrative review was consistent with the antidumping statute and supported by substantial evidence:

India, though, had a per capita GNI of $1,340, whereas [China] had a per capita GNI of $4,260. Given that disparity, as well as the availability of surrogate value data from two other economically comparable countries, Commerce's decision to not select India appears reasonable; it is difficult to envision how India would have been a reasonable or defensible choice on this administrative record.

. . . .

[Jiaxing], however, omit[s] from [its] analysis other apparent "material factors of economic comparability" contained on the administrative record that tend to demonstrate greater similarities between [China] and Thailand than [China] and India, including per capita GDP, life expectancy, adult literacy, and GDP composition by sector of origin.

. . . .

India therefore could never be a reasonable choice because at least one country, the Philippines, satisfies the statutory criterion of economic comparability, whereas India does not. [Jiaxing's] argument about the qualitative superiority of Indian data compared to Thai data ultimately concentrates on a false choice.

*Jiaxing I,* 961 F. Supp. 2d at 1329, 1330–32 (citations omitted).

That India has a long history as serving as the surrogate country to China does not mean Commerce is re-

strained from considering the adequacy of other countries to serve that role. Commerce is required to base surrogate country selection on the facts presented in each case, and not on grounds of perceived tradition. "[E]ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao*, 766 F.3d at 1387. There is no legal requirement that India serve as a surrogate country to China. *Clearon*, 36 I.T.R.D. (BNA) 788, 2014 Ct. Intl. Trade LEXIS 88, at *34 ("Commerce is not required by statute or regulation to select the same surrogate country it did in previous reviews, or the country with largest economy, or the most populated country . . . ."). Nor did the selection process lack transparency. Commerce reviewed the parties' comments submitted after it issued the list of potential surrogate countries, and Commerce provided notice of its preliminary and final determinations—even though Commerce was not required to give prior notice that it had selected Thailand over India. *Cf. Tehnoimportexport v. United States*, 766 F. Supp. 1169, 1175 (Ct. Int'l Trade 1991) (holding that Commerce had no obligation to notify the parties beforehand that it had chosen a different surrogate country for the final determination than it used in the initial determination). We hold that Commerce's past practice alone of selecting India as the surrogate country does not restrain Commerce from selecting a country other than India to serve as the surrogate country.

### Commerce's Selection of Thailand over the Philippines

We next address whether Commerce's selection of Thailand over the Philippines as the surrogate country was contrary to law and not supported by substantial evidence. Jiaxing argues that Commerce erred in (1) relying on the financial statement of the Thai corporation CEN, (2) emphasizing the value of steel over other inputs, and (3) favoring Thai HCl data over Philippine HCl data.

First, Jiaxing argues that the CEN financial statement was not the best available information available in the record. In addition to CEN's financial statement, the record contains four Indian and four Philippine financial statements. Jiaxing argues that Commerce's use of the CEN financial statement is unreasonable because CEN's principal business is investment, not steel production. J.A. 661. Jiaxing cites a previous Commerce decision that CEN was not a manufacturer of steel wire rod.[18] Jiaxing also challenges the accuracy of the CEN financial statement, arguing that the statement does not provide cost breakouts and that the record lacked an original-language-translation version of the statement. Jiaxing further asserts that CEN is a beneficiary of "concessionary tax rates," which skews the data.

Second, Jiaxing asserts that Commerce erred in emphasizing steel inputs at the expense of non-conforming data. Jiaxing notes that the Thai wire rod values are 40% higher than the world market prices, and that Vulcan recently sued Thailand for dumping and injuring the U.S. steel threaded rod industry.[19]

Jiaxing further argues that the Thai import value for HCl is questionable because the data are inconsistent with the value of domestic Thai HCl products and the import value of HCl products shipped by other countries to Thailand. J.A. 12–14.

---

[18] *See Steel Wire Garment Hangers From the People's Republic of China: Antidumping Duty Administrative Review, 2010-2011*, 77 Fed. Reg. 66952 (Nov. 8, 2012) ("*Wire Hangers*").

[19] *See Steel Threaded Rod From Thailand: Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 Fed. Reg. 79670 (Dep't of Commerce Dec. 31, 2013).

We conclude that Commerce's selection of Thailand over the Philippines as the surrogate country is reasonable and supported by substantial evidence. The question here is not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information. *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011).

We also conclude that Commerce reasonably relied on the CEN financial statement, and that substantial evidence supports Commerce's findings. The record shows that only three of the Philippine financial statements are relevant because one company produces steel wire mesh fencing, which is not drawn from wire rod. J.A. 1393–94. Although CEN was primarily an investment company, one of its subsidiaries produced pre-stressed concrete wire, which is drawn from wire rod. CEN also generated almost 50% of its income in 2010 from wire industries. J.A. 629. In addition, the CEN financial statement presented financial ratios similar to Jiaxing. J.A. 1393.

Jiaxing's argument that Commerce's rejection of CEN's financial statement in *Wire Hangers* compels the same result in this case is unpersuasive. We agree with the Trade Court that the CEN data in this case is different than that in *Wire Hangers*:

> The CEN data at issue in this review is *not* the same as the CEN data in *Wire Hangers*. The *Wire Hangers* review focused on a CEN *financial statement* from 2011 whereas this record features a CEN *annual report* from *2010*. [Vulcan] clarifies that the 2010 annual report on this record includes CEN's 2010 financial statement as well as extra details about the operations of CEN's subsidiaries. Commerce also explains that steel threaded rod and wire hangers do not have identical manufacturing processes or inputs.

*Jiaxing II*, 11 F. Supp. 3d at 1330 (emphases in original and internal citations omitted).

Commerce correctly rejected arguments that CEN received certain concessionary taxes that could have skewed the CEN data. The record evidence shows that any concessionary taxes that were received by CEN occurred outside the relevant review period. In addition, there is no record evidence that the CEN financial statement was translated inaccurately or was otherwise erroneous.

Commerce's decision to emphasize the steel input was reasonable and supported by substantial evidence. Jiaxing does not dispute that steel is the main input and primary driver of cost for steel threaded rod. Though the data may be imperfect, the administrative record supports the conclusion that the Thai data identified a low carbon variety that matches more closely to the main input of the subject merchandise than the data that Jiaxing proposes. *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014) ("The data on which Commerce relies to value inputs must be the 'best available information,' but there is no requirement that the data be perfect.").

Commerce's choice to prioritize steel costs over other inputs is also not erroneous because almost all Jiaxing's production costs are subsumed by the cost of steel. *See Downhole Pipe*, 776 F.3d at 1380 (endorsing the use of a "primary input" to calculate surrogate value). That Thai steel prices are unusually high does not in this case necessarily imply that the prices are aberrant where the evidence shows that Thai steel was superior to Philippine steel. *See Downhole Pipe*, 776 F.3d at 1380 (rejecting that an "aberrantly high" value is "outside the bounds of commercial reality," and holding that the value was "the best evidence available on the record").

Finally, we find no error in Commerce's determination to use Thai import statistics to value HCl, a conclusion in accordance with its administrative preference to appraise surrogate values from a single surrogate country. *See* 19 C.F.R. §351.408(c)(2). The record evidence shows that the HCl import statistics from India and Thailand were equally usable (both were specific, contemporaneous, and represented broad market averages), so Commerce's choice to use the Thai import statistics is supported by substantial evidence.

CONCLUSION

Commerce's decision to select Thailand as the surrogate country on which to base Chinese cost of production, values was reasonable, supported by substantial evidence, not arbitrary or capricious, and otherwise in accordance with law. The decision of the Trade Court is *affirmed*.

**AFFIRMED**

COSTS

Each party shall bear its own costs.